IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STEPHENS V. STEPHENS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CHRISTOPHER M. STEPHENS, APPELLEE,

V.

JENNIFER J. STEPHENS, NOW KNOWN AS JENNIFER J. STONE, APPELLANT.

Filed May 3, 2022.    No. A-21-583.

Appeal from the District Court for Douglas County: THOMAS A. OTEPKA, Judge. Affirmed as modified.

Kathryn D. Putnam, of Astley Putnam, P.C., L.L.O., for appellant.

Matthew Stuart Higgins, of Higgins Law, for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

INTRODUCTION

Jennifer J. Stephens, now known as Jennifer J. Stone, appeals an order of the district court for Douglas County which modified the decree that dissolved Jennifer's marriage to Christopher M. Stephens in 2015. The district court modified the decree by eliminating the mutual right of first refusal for parenting time with the parties' daughter, Emersyn. On appeal, Jennifer not only challenges the district court's decision to eliminate the right of first refusal, but also asserts that the district court should have modified the decree to award her and Christopher joint physical custody of Emersyn or, in the alternative, should have modified the decree to at least award her additional parenting time.

Upon our review, we affirm the district court's decision to deny Jennifer's request for joint physical custody and to eliminate the right of first refusal. However, we find the district court abused its discretion in not granting Jennifer additional parenting time. We modify the court's

- 1 -

order to award Jennifer additional parenting time in accordance with a Memorandum of Understanding entered into by the parties in 2016.

## BACKGROUND

Jennifer and Christopher were divorced pursuant to an agreed-upon decree entered by the district court on January 15, 2015. As a part of the consent decree, Jennifer and Christopher agreed that they would share joint legal custody of their daughter, Emersyn, who was then four years old. They also agreed that Christopher would have primary physical custody of Emersyn subject to Jennifer's parenting time. Jennifer was to have parenting time with Emersyn every Wednesday from 3 p.m. until 7:30 p.m. and every weekend from noon on Saturday until 10 a.m. on Sunday. Jennifer was also permitted to have parenting time for two non-consecutive weeks during the summer months and for certain holidays. The agreed-to parenting plan also provided: "Right of First Refusal -- The parents agree that, in the event either party requires childcare during his or her parenting time, that party shall first contact the other to determine whether the other parent is available to care for the child."

Pursuant to the consent decree, Jennifer was not obligated to pay child support to Christopher. However, she was obligated to pay half of all child care and medical expenses, in addition to half of all other necessary and reasonable expenses for Emersyn's care.

In August 2016, Jennifer and Christopher met with a mediator in an attempt to resolve issues that had arisen as a result of the parenting plan they had agreed to as part of the 2015 decree of dissolution. After meeting with the mediator, they jointly entered into a Memorandum of Understanding which was to temporarily alter the parenting time schedule delineated in the decree. Pursuant to the Memorandum of Understanding, Jennifer was still to have parenting time with Emersyn every Wednesday after school, but only until 7 p.m., rather than until 7:30 p.m. as the decree had provided. Jennifer was to notify Christopher by noon on Wednesday if she would be exercising her parenting time that evening. If she did not so notify him, her parenting time would be forfeited. Jennifer's weekend parenting time with Emersyn was changed to provide for time every other weekend from Friday after school through Sunday at 7 p.m. rather than the 22 hour window of time provided every weekend under the decree.

The Memorandum of Understanding also addressed the right of first refusal which was included in the 2015 decree and accompanying parenting plan. It stated:

> The parties are in disagreement in regards to the interpretation of the language of the right of first refusal. This is an issue they may choose to address in the upcoming mediation. During the time that this Memorandum of Understanding is in effect, the parties agree that neither party will initiate a contempt action against the other on the grounds that the right of first refusal was improperly denied to them.

While the Memorandum of Understanding indicated that its terms were only to be in effect until approximately November 2016, evidence presented at the modification trial indicated that the terms of the Memorandum of Understanding were actually followed by the parties up until the time of the modification trial in 2021.

Jennifer filed a complaint to modify the 2015 decree of dissolution on October 9, 2019. She alleged a material change of circumstances had occurred since the entry of the decree due to

(1) changes in her work schedule and in her physical and mental health, (2) Christopher's unwillingness to involve her in decisions about Emersyn's day-to-day life, (3) Christopher's unwillingness to provide her with any additional parenting time, particularly pursuant to the right of first refusal, and (4) Emersyn's desire to have more time with Jennifer now that she is older. Jennifer requested that the decree be modified such that she and Christopher be awarded joint physical custody of Emersyn.

Christopher filed an answer and cross-complaint for modification on November 15, 2019. In his answer, Christopher denied Jennifer's assertions that there had been material changes in circumstances which warranted a change to Emersyn's physical custody. However, in his cross-complaint for modification, Christopher alleged that there had been material changes in circumstances which warranted a change to Emersyn's legal custody and which warranted a change to the prior child support order. Christopher alleged that the material changes in circumstances included Jennifer's lack of cooperation in co-parenting Emersyn and in making decisions about Emersyn's well-being. Christopher also pointed to Jennifer's failure to regularly exercise her parenting time with Emersyn. Christopher requested that the decree be modified to award him sole legal custody of Emersyn and to require Jennifer to pay child support.

Trial began on January 19, 2021. It continued on multiple dates over the next few months until finally concluding on May 21. At trial, Jennifer and Christopher testified extensively and offered into evidence voluminous exhibits, including the text messages which had been exchanged between the parties since the entry of the decree in 2015. Jennifer also presented testimony from her new husband and Christopher presented testimony from his new wife and his new wife's ex-husband. Emersyn, who was ten years old and in the fifth grade by the time of trial, was interviewed by the court in camera with only the parties' counsel present. Such interview was conducted at the beginning of trial pursuant to the request of Jennifer. The district court informed Emersyn that what she said during the interview would be kept confidential. As such, we do not discuss the specifics of Emersyn's testimony. However, we do note that we have fully reviewed her testimony and the subsequent testimony of Jennifer and Christopher. It is obvious from their testimony that they became aware of the gist of what Emersyn's stated wishes were. Therefore, we note that Emersyn expressed satisfaction with the current parenting time schedule which has her spending every other weekend and every Wednesday afternoon with Jennifer. Emersyn expressed no desire for that schedule to change.

At trial, Jennifer testified about her circumstances both at the time the decree was entered in January 2015 and at the time of the modification hearing in the first part of 2021. At the time the decree was entered, Jennifer was unemployed and was living with her parents. She was suffering from depression due to the recent loss of her job and the end of her marriage. In addition, she was suffering from frequent migraines which she attributed to the amount of stress she was under. Jennifer explained that at this time, even though she and Christopher had dissolved their marriage, they were continuing to work on their relationship and were engaging in an ongoing sexual relationship. However, Jennifer also explained that she had agreed to having limited parenting time with Emersyn as part of the consent decree because she "just wanted out of the marriage" and because things with Christopher were "awful." Jennifer believed that she could gain additional parenting time with Emersyn after she worked on her mental health and gained new employment.

Some months after the entry of the decree, Jennifer acquired new employment. This employment required her to travel somewhat frequently. As a result, she had to miss some of her scheduled parenting time. At around this same time, Jennifer's and Christopher's efforts at reconciliation came to an end. As a result, Jennifer's ability to spend additional time with Emersyn outside of the parenting plan also came to an end. According to Jennifer, Christopher would now only allow her to see Emersyn during her scheduled parenting time and would not always allow her to make up any parenting time that she had to miss due to her work obligations. Because Jennifer believed she did not have enough time with Emersyn, she filed for modification of the original decree of dissolution in 2016. Such filing led to the parties' engaging in mediation and agreeing to alter Jennifer's parenting time, as provided for in the Memorandum of Understanding discussed above. Subsequently, Jennifer was "laid off" from her job in 2017.

By the time of the 2021 modification trial, Jennifer was married to Christopher Stone (Stone), whom she began dating in August 2015. She and Stone live in a five-bedroom home, which they purchased from Jennifer's parents. Stone's two teenage sons live in the home with Jennifer and Stone 50 percent of the time pursuant to Stone's custody arrangement with his ex-wife. The two boys and Emersyn each have their own room. Jennifer testified that Emersyn has a positive relationship with Stone and with her step-brothers. Jennifer indicated that while she still takes a low dosage of medication for her depression and anxiety, she no longer struggles with her mental health. She testified that she has not had migraines for several years.

On the first day of Jennifer's testimony, she indicated that she had recently acquired a new job in the human resources department of a charity which works with disabled individuals. Her expected salary was $75,000 per year. However, by the second day of Jennifer's testimony a few months later, she testified that she had been "let go" from this employment after only two and one-half weeks of work. Jennifer did not believe her termination was performance related. Jennifer had not found any further employment, but had been attending interviews.

Jennifer testified that in the years preceding the modification trial, she had exercised almost all of her designated parenting time with Emersyn pursuant to the Memorandum of Understanding. She indicated that during her parenting time, she is always actively engaged with Emersyn, including going places together, playing board games, and watching movies as a family. In fact, Jennifer explained that because she has so little time with Emersyn, that she is "selfish" with their time together, not wanting her to go on play dates. Jennifer testified that she regularly attends parent-teacher conferences for Emersyn and stays in communication with Emersyn's teachers. She also does her best to attend all of Emersyn's school, extracurricular, and sporting activities. Jennifer and her family have also attended all of Emersyn's religious milestone ceremonies. Jennifer indicated that she desires to have more time with Emersyn because she loves Emersyn very much, because she constantly misses Emersyn when they are apart, and because she believes additional time would strengthen their mother-daughter bond. In particular, Jennifer testified that she has noticed that Emersyn can act distantly toward Jennifer at the beginning of her parenting time when they have not seen each other in over a week. Jennifer believes this problem would be rectified if they saw each other more often and more consistently.

While Jennifer testified that Christopher has never denied her any scheduled parenting time pursuant to the 2016 Memorandum of Understanding, she also testified that he has never given her any significant additional parenting time, particularly under the right of first refusal provision in

the original parenting plan. Jennifer testified to numerous situations over the years where she asked for additional parenting time pursuant to the right of first refusal and was denied. She also testified to multiple occasions when Christopher was inflexible about her wanting to alter the parenting plan temporarily in order to accommodate her or Emersyn's schedule. Jennifer also cited to Christopher's routine of having nightly conversations with Emersyn during her parenting time as evidence of his interfering with her limited time with Emersyn. Jennifer believed that the contact upset Emersyn more than it comforted her.

Jennifer testified that ultimately she wants the parenting plan to be modified such that she and Christopher share joint physical custody of Emersyn. She proposed that she have physical custody of Emersyn from Monday morning before school through Wednesday morning before school. Christopher would then have Emersyn from Wednesday afternoon after school through Friday morning before school. The parties would alternate weekends with Emersyn. In the alternative to the district court awarding the parties with joint physical custody, Jennifer asked that she be at least awarded additional parenting time such that she has more overnights with Emersyn and has more extended time with her on a regular basis. During her testimony, Jennifer also indicated that she wished the parenting plan to be modified to alter the division of the New Year's Eve and New Year's Day holidays and to alter the summer parenting time each party receives.

Jennifer conceded that she does not have any disagreements with regard to Christopher's choice of Emersyn's health care, education, or religious upbringing. She also admitted that Emersyn is a well behaved, happy, healthy child who is well socialized and gets straight A's in school. Upon being questioned about how Emersyn's behavior, grades, socialization, physical health, or religious upbringing would be enhanced by modifying the decree to award the parties with joint physical custody, Jennifer was unable to provide any specific answer, other than to state that Emersyn may be exposed to different things at her house than at Christopher's house. Jennifer also indicated her belief that there would certainly be no negative impact as a result of her spending more time with Emersyn. She testified that Emersyn spending more time with her is simply good for Emersyn and that having only limited time together as the Memorandum of Understanding provides, is not in Emersyn's best interests. Finally, Jennifer testified that even though she asked that Emersyn be interviewed in camera by the district court, that she did not necessarily believe Emersyn's opinion about custody should be given much weight.

Stone, Jennifer's current husband, generally corroborated Jennifer's testimony about Emersyn being well-bonded with Jennifer and with their entire family. He described Jennifer as an "excellent" mother and step-mother. Stone further described Jennifer as being very engaged during her parenting time with Emersyn. Whenever Emersyn is at their house, she and Jennifer are together doing all kinds of different activities. In addition, his teenage sons play with Emersyn whenever she wants to spend time with them. Stone indicated that if their family were to miss one of Emersyn's activities it would be the exception to their general practice of attending Emersyn's events.

Stone described Emersyn as a very well-behaved, sweet, and loving child. He believed that Emersyn's life would be improved by spending more time with Jennifer because Jennifer and Emersyn are the same gender and Jennifer can help Emersyn mature into a young woman. Stone indicated that he believes that Christopher has tried to alienate Emersyn from Jennifer somewhat. In addition, Stone testified that Christopher is not a cooperative co-parent.

At the time of the modification trial, Christopher and Emersyn were living in a home with Christopher's new wife, Michelle, and her two daughters from a previous marriage. Michelle's two daughters are very close in age to Emersyn. Christopher testified that the three girls are very bonded. In addition, Emersyn is very close with Michelle, even referring to her as "mom." Christopher is employed as an account executive and earns $70,000 per year plus a bonus. While he has had a few different jobs since the 2015 decree was entered, he has always been employed. Christopher explained that he has worked from home for most of the last three or four years. Michelle is a realtor who is able to set her own schedule in order to take care of the girls, including dropping them off and picking them up from school.

Christopher testified that he shares a very strong bond with Emersyn.

[Emersyn] is the kindest girl that anybody will ever meet in their life. Her heart is pure. The bond her and I have, I think most dads would kill to have that relationship with their daughter. And I don't feel I'm the best dad at times, but her and I make it work.

Together, Christopher and Emersyn go on bike rides and walks, go fishing, practice baseball, play board games, and watch football. In fact, Christopher explained that it is Emersyn, and not him, who insists on talking every night when she is with Jennifer. Christopher noted that Emersyn thrives when she is provided with a routine and structure. He opined that a joint physical custody arrangement would be disruptive to the routine she now enjoys.

During Christopher's testimony, he refuted Jennifer's rationale for not pushing for more parenting time with Emersyn in the 2015 decree of dissolution. Christopher indicated that at that time, Jennifer simply did not want to spend a lot of time alone with Emersyn. He did not recall that Jennifer was suffering from "debilitating migraine headaches" or from severe anxiety and depression. He did, however, recall asking her to seek counseling to address her "erratic" behavior. And, he did concede his belief that in 2015 Jennifer was suffering from some kind of mental health issue. He testified that he believes Jennifer still struggles with her mental health.

Christopher also indicated his belief that Emersyn spending more time with Jennifer would be a detriment to Emersyn. Specifically, he believes that Jennifer does not emphasize school as much at her house because Emersyn is never required to do her homework during Jennifer's parenting time. Christopher also discussed at length his concerns that Emersyn does not practice good hygiene at Jennifer's house because she does not shower as regularly there as she does at his house. He indicated that Jennifer has just started to increase her attendance at Emersyn's activities and events in the months leading up to the modification trial.

Christopher described Jennifer as a "paper parent," meaning that she wants to have all of the good parts of parenting without doing any hard work or having difficult conversations. Christopher provided an example from the time that Emersyn's maternal great-grandmother passed away. Jennifer did not talk to Emersyn about this event, but instead left it to Christopher to discuss. Christopher also pointed to Jennifer never exercising her parenting time when she is sick. Christopher emphasized his belief that parents do not get "sick days." Christopher was upset with Jennifer's decision to have Emersyn speak with the district court as part of the modification trial. Christopher indicated that it was very difficult for Emersyn to testify and that she had been worried and upset about it for some time in advance.

Christopher indicated that he tries to provide Jennifer with make-up parenting time when she has to miss her regularly scheduled time. However, he conceded that he has not always been able to provide such make-up time due to his family's, and Emersyn's, schedules and due to oftentimes receiving such requests without much notice. He also conceded that he has not always granted Jennifer's requests for additional parenting time beyond what is provided to her in the 2016 Memorandum of Understanding. In addition, he has not affirmatively offered Jennifer additional parenting time when he has been working and Emersyn has been home with Michelle. However, pursuant to his understanding of the right of first refusal, he did offer Jennifer extended parenting time with Emersyn on a few occasions when he has had to travel out of town for work. Christopher also testified that he does his best not to schedule things for Emersyn during Jennifer's parenting time, but conceded that sometimes this is unavoidable.

Christopher indicated that he finds it "very difficult" to communicate with Jennifer about Emersyn, but noted that Jennifer has never complained about his choice of Emersyn's doctors, schools, religious training, or activities. Ultimately, Christopher requested that the district court modify the 2015 decree of dissolution only to eliminate the right of first refusal, to clarify the division of the New Year's Eve and New Year's Day holidays, and to provide that he is to bring Emersyn to Jennifer for her parenting time and that Jennifer is to return Emersyn after her parenting time. He testified that he has always tried to do what is in Emersyn's best interests. He believes that Emersyn's opinion about custody should be considered by the district court.

Michelle testified at the modification trial that Emersyn has a very strong bond with Christopher. In addition, Emersyn is well-bonded to Michelle and to Michelle's two daughters. Michelle described Emersyn as a happy, funny, kind girl who loves to play with her step-sisters and do activities together as a family. Emersyn has confided in Michelle, including asking for her opinions on personal matters. Michelle has observed Emersyn to seem nervous or reserved prior to going to Jennifer's house for her parenting time. However, she is always happy to return to their home. Michelle indicated that she typically takes and picks up all three girls from school and that both she and Christopher help them with their homework in the afternoons.

Michelle's ex-husband and the father of her two daughters briefly testified. He indicated that he has regular parenting time with the two girls every other weekend and every Wednesday evening, but Michelle has primary physical custody. He believes Christopher to be a good step-father and has had no difficulties interacting with him.

The district court entered its order on June 21, 2021. In the order, the court ultimately found that it would not be in Emersyn's best interests to modify the 2015 decree by awarding the parties joint physical custody. In reaching this decision, the district court did not explicitly decide whether Jennifer had proven that a material change of circumstances had occurred since the 2015 decree:

> All things considered as they must, even if Jennifer was able to prove by a preponderance of the evidence that there was a material change of circumstances since the time of the Decree and affecting the best interests of Emersyn -- she would have passed the first step, but not by much, but there is another required step she did not make -- the second and equally important step, proof that changing the child's custody is in the child's best interest.

Rather, the district court found that Jennifer simply did not sufficiently demonstrate that any change in custody was in Emersyn's best interests.

Based upon all the evidence of the trial and relevant legal authority, the Court cannot find that it would be in Emersyn's best interest to change custody. There really was no persuasive, credible evidence to the contrary. When Jennifer was questioned why changing Emers[y]n's custody to 50/50 would be in the child's best interest she was hard pressed to answer, but did say that she felt every "parent" should have equal custody, which begs the question.

The court ordered that "[t]he Decree of Dissolution of Marriage dated January 15, 2015 shall remain in full force and effect except" that "the Right of First Refusal provision should be removed from the Parenting Plan." The court indicated that the right of first refusal was being eliminated due to the parties' disputes regarding such provision and due to "the potential for disruption and upheaval in the future."

Jennifer appeals to this court.

## ASSIGNMENTS OF ERROR

On appeal, Jennifer assigns three errors. First, she asserts that the district court erred in not modifying the original decree by awarding the parties joint physical custody of Emersyn. Second, she asserts that the court erred in not giving her any additional parenting time with Emersyn beyond what the original decree of dissolution provided. Finally, Jennifer asserts that the district court erred in eliminating the mutual right of first refusal.

## STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *Windham v. Kroll*, 307 Neb. 947, 951 N.W.2d 744 (2020). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017).

## ANALYSIS

*Failure to Modify Decree to Award Joint Physical Custody.*

Jennifer's first assignment of error on appeal is that the district court erred in failing to modify the 2015 decree of dissolution to award the parties with joint physical custody of Emersyn. Before we address this assignment of error, we recount the pertinent law which overlays our analysis of the district court's modification order. Such law applies to each of Jennifer's assigned errors in this appeal.

In a child custody modification action the party seeking modification must demonstrate first that a material change in circumstances has occurred after the entry of the previous custody order which affects the best interests of the child and that it is in the child's best interests that custody be changed. *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016). A material change in circumstances means the occurrence of something which, had it been known at the time of the initial decree, would have persuaded the court to decree differently. *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015). The party seeking modification of child

custody bears the burden of showing as an initial matter that there has been a change in circumstances. *Id*.

The child's best interests require a parenting arrangement and plan which provides for a child's safety, emotional growth, health, stability, physical care, and regular and continuous school attendance and progress. Neb. Rev. Stat. § 43-2923 (Reissue 2016). Moreover, § 43-2923 sets forth a non-exhaustive list of factors to be considered in determining the best interests of a child in regard to custody. Such factors include the relationship of the minor child with each parent, the desires of the minor child, the general health and well-being of the minor child, and credible evidence of abuse inflicted on the child by any family or household member. Specifically regarding the desires of a minor child, the statute provides that the court should consider "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning." § 43-2923(6)(b). The Nebraska Supreme Court in applying this provision has stated that while the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). The Supreme Court has also found that in cases where the minor child's preference was given significant consideration, the child was usually over 10 years of age. *Id*.

We now consider Jennifer's assertion that the district court erred in failing to modify the decree by awarding the parties joint physical custody of Emersyn. In her brief on appeal, Jennifer indicates that the district court found that she had proven a material change in circumstances which warranted a change to the prior custody arrangement. Christopher argues that the order of the court actually finds no material change of circumstances, but proceeds to discuss the best interests issue out of an abundance of caution. Based on our reading of the district court's order, we find that both parties have a sound basis for their argument. Ideally, the court would have been more definitive. The court stated:

> All things considered as they must, even if Jennifer was able to prove by a preponderance of the evidence that there was a material change of circumstances since the time of the Decree and affecting the best interests of Emersyn -- she would have passed the first step, but not by much[.]

The court then went on to find that even if Jennifer had proven a material change in circumstances, she had not proven that a change in the prior custody order was in Emersyn's best interests.

We first note that, according to well-established case law, a trial court must first definitively determine whether a material change in circumstances has occurred which would warrant a change to a prior custody order. Only if such a material change in circumstances has occurred should the trial court make a finding as to whether the child's best interests requires modification. See, e.g., *Hoschar v. Hoschar*, 220 Neb. 913, 374 N.W.2d 64 (1985) (*disapproved on other grounds*, *Parker v. Parker*, 234 Neb. 167, 449 N.W.2d 553 (1989)) (explaining that in response to motion to modify custody decree, before trial court considers what is in the best interests of the children, the court must first find that there has been a material change of circumstances which occurred after entry of earlier order granting custody and which affects best interests of children). Here, upon our careful reading of the district court's modification order, we determine that the court was aware of the requirement that it must first determine whether there

had been a material change in circumstances. Had it believed that there was no material change of circumstances, it would not have proceeded to the best interests analysis. Therefore, we find that the court ultimately found that Jennifer had proven a material change in circumstances, even though the evidence in this regard was not particularly strong. The court then moved on to find that despite that material change in circumstances, Emersyn's best interests did not require a change to the prior custody order.

Upon our de novo review, we cannot say that the district court abused its discretion in concluding that Jennifer had met her burden of proving a material change in circumstances. We also find that the district court did not abuse its discretion in determining that modifying the prior custody order to award joint physical custody was not in Emersyn's best interests.

The evidence presented by both parties at the modification trial indicated that Emersyn is a happy, well-behaved, athletic, and intelligent child. She was doing well in school, was heavily involved in extracurricular activities, and had a good social circle. Neither Jennifer nor her current husband could affirmatively identify how Emersyn's life would be improved if joint custody was awarded to Jennifer and Christopher, other than that Emersyn would get to spend more time with Jennifer. However, as we explained above, Emersyn expressed satisfaction with the current parenting time schedule which has her spending every other weekend and every Wednesday afternoon with Jennifer. Emersyn expressed no desire for that schedule to change. In addition, other evidence presented at the modification trial indicated that Emersyn is clearly more closely bonded to Christopher, her step-mother, and her step-sisters, than she is to Jennifer, her step-father, and her step-brothers. Emersyn comfortably discusses a range of topics with Christopher and her step-mother, but does not have these sorts of discussions with Jennifer. According to Christopher, Jennifer does not like to discuss serious or difficult topics with Emersyn. In addition, while Emersyn sometimes displays anxiety when transitioning to Jennifer's home, she is always happy to return to Christopher's home.

Essentially, we do not find that the district court abused its discretion in finding that Emersyn's best interests do not require an award of joint custody. Emersyn is thriving under her current circumstances and indicated a desire for her time with Jennifer to remain unchanged. Moreover, there was no evidence to suggest that Emersyn's circumstances would be enhanced by any sort of change to the current custodial arrangement. Accordingly, we affirm the district court's order which essentially grants Christopher continuing sole physical custody of Emersyn.

*Failure to Modify Decree to Award Additional Parenting Time.*

In her brief on appeal, Jennifer asserts that if we do not find that the district court erred in failing to modify the 2015 decree to award the parties joint physical custody, that we should find the court erred in not at least increasing her parenting time. We find that Jennifer's assertion has merit.

The trial court has discretion to set a reasonable parenting time schedule. *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016). The determination of reasonableness is to be made on a case-by-case basis. *Wolter v. Fortuna*, 27 Neb. App. 166, 928 N.W.2d 416 (2019). Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. *Id*. The best interests of the child is the primary and paramount consideration in determining and modifying parenting time. See *Schriner v. Schriner*, 25 Neb. App. 165, 903

- 10 -

N.W.2d 691 (2017). Here, the district court's modification order denied Jennifer's alternative request to increase the amount of parenting time awarded to her under the 2015 decree when it stated, "The Decree of Dissolution of Marriage dated January 15, 2015 shall remain in full force and effect except as specifically modified herein." The only modification made to the 2015 decree was to eliminate the right of first refusal provision. The court explained that it was not in Emersyn's best interests to modify the custody arrangement or "the parenting time schedule set out in their Parenting Plan with the exception of the Right of First Refusal." The district court's decision effectively awards Jennifer only that parenting time granted to her in the 2015 decree. Such parenting time included every Wednesday afternoon from 3 p.m. until 7:30 p.m. and every weekend from noon on Saturday until 10 a.m. on Sunday.

The evidence presented at trial revealed that the parties had not been following the parenting time schedule established in the 2015 decree since 2016. At that time, they voluntarily entered into a Memorandum of Understanding which while leaving Jennifer's parenting time every Wednesday unchanged, increased her weekend parenting time. While her weekend time became less frequent, she received a larger block of time on her weekends resulting in a net gain of eight hours of parenting time over a two week period. The parties agreed that although such change was originally meant to be temporary, they had abided by the altered schedule for more than four years by the time of the modification trial. In addition, at oral argument, Christopher's counsel conceded that Christopher had no objection to modifying the parenting plan in order to mirror the parenting time arrangement delineated in the Memorandum of Understanding.

Upon our review, we find that the parties' voluntary alteration to Jennifer's parenting time schedule constitutes a material change in circumstances which would warrant a permanent change to the parenting time schedule delineated in the 2015 decree. We further find that modifying the decree to be consistent with the parenting time schedule adopted by the parties is in Emersyn's best interests. At trial, there was no testimony that the parenting time schedule established in the Memorandum of Understanding was not working. In fact, according to the evidence presented at the trial, the altered schedule was convenient for Christopher as it mirrored his step-daughters' schedule with their father. And, Jennifer had no specific complaints with the altered schedule other than that she wanted even more time. As we mentioned above, Emersyn's testimony generally indicated that she was happy with the schedule the way it currently was. Christopher also testified that Emersyn thrives on consistency and routine. Keeping the parenting time schedule in line with the 2016 Memorandum of Understanding would provide Emersyn with such consistency and routine. Given this evidence and Christopher's explicit indication that he has no objection to modifying the parenting plan in accordance with the Memorandum of Understanding, we find that the district court abused its discretion in failing to modify the original parenting plan to mirror the plan adopted by the parties in the 2016 Memorandum of Understanding. We modify the district court's order to award Jennifer additional parenting time in accordance with the Memorandum of Understanding entered into by the parties in 2016.

*Modifying Decree to Eliminate Right of First Refusal.*

Jennifer asserts that the district court erred when it eliminated the right of first refusal provision from the 2015 decree. She contends that eliminating the provision amounted to a "de

facto reduction in [her] parenting time." Brief for appellant at 36. Upon our review, we affirm the decision of the district court in this regard.

We note that while neither Jennifer nor Christopher specifically requested that the court eliminate the right of first refusal provision in their pleadings, each of their pleadings did ask the district court to modify the parenting plan delineated in the 2015 decree. The right of first refusal was part and parcel of that parenting plan. Moreover, the parties clearly perceived the issue of the right of first refusal to be part of the bigger picture about whether to modify the parenting plan as the issue was the focus of a significant portion of the trial. The parties testified to their interpretations of the provision and thoroughly discussed their opinions regarding whether the provision had been correctly utilized. During his testimony, Christopher specifically requested the court eliminate the right of first refusal provision. Accordingly, we conclude that the district court had the authority to eliminate the right of first refusal provision when making a determination about the modification of the original parenting plan and the best interests of the child.

In addition, we can find no abuse of discretion in the court's decision to eliminate the right of first refusal provision. The provision was not workable as it was written, as it had no parameters about when it was triggered: "Right of First Refusal -- The parents agree that, in the event either party requires childcare during his or her parenting time, that party shall first contact the other to determine whether the other parent is available to care for the child." The provision does not indicate how long a parent must be away before having to contact the other parent to provide childcare. Jennifer believed the provision to require Christopher to contact her whenever he needed childcare for any length of time. Christopher, on the other hand, believed the provision only required him to contact Jennifer to provide childcare if he had to be out of town overnight. The vague language in the provision contributed to the parties' ongoing disagreement, particularly in light of their other communication issues. We cannot say that it was an abuse of discretion for the district court to simply eliminate this provision from the parenting plan in order to prevent "the potential for disruption and upheaval in the future."

CONCLUSION

Based upon our de novo review of the record, we find that the district court did not abuse its discretion in denying Jennifer's request to modify custody to award the parties with joint physical custody or in eliminating the right of first refusal from the parenting plan. We modify the district court's order to award Jennifer additional parenting time in accordance with the parties' 2016 Memorandum of Understanding.

AFFIRMED AS MODIFIED.